UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _10/1/2020_____
```

MIKE CASARELLA,

                           Plaintiff,

     -against-

NEW YORK STATE DEPARTMENT OF
TRANSPORTATION, MIKE CRESNO,
individually and in his official capacity,
HECTOR BORANCO, individually and in his
official capacity, JOHN AND JANE DOES 1-10,
individual and in their official capacities, and
XYZ CORP. 1-10,

                         Defendants.

No. 16-cv-9531 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

       Plaintiff Mike Casarella ("Plaintiff") brings this action against Defendants New York

State Department of Transportation (the "DOT"), Mike Krasnow ("Krasnow"), individually and

in his official capacity, and Hector Barranco ("Barranco"),[1] individually and in his official

capacity (collectively, "Defendants"), pursuant to Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 12101 *et seq.*, the New York State Human Rights Law

("NYSHRL"), New York Executive Law § 290, *et seq.*, and 42 U.S.C. 1983 ("§ 1983").  (*See*

First Amended Complaint ("FAC") (ECF No. 15.)[2]

       Presently before the Court is Defendants' motion for summary judgment dismissing the

First Amended Complaint ("FAC") in its entirety pursuant to Federal Rule of Civil Procedure 56.

(ECF No. 76.)  For the reasons that follow, Defendants' motion is GRANTED in part and

---

[1] Mike Krasnow and Hector Barranco are incorrectly sued herein as "Mike Cresno" and "Hector Boranco,"
respectively.
[2] Plaintiff's claims pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*,
and New York Workers' Compensation Law §120 have been dismissed in their entirety.  (ECF No. 43.)

DENIED in part.

## BACKGROUND

The following facts are derived from the parties' respective Local Rule 56.1 statements and a review of the record, and are uncontested except where otherwise indicated.

### A.  Plaintiff's Employment with the DOT

Beginning on March 18, 2015, through October 2, 2015, Plaintiff worked for the DOT as a probationary Highway Maintenance Worker Trainee II.  (Defs.' Local Rule 56.1 Statement ("Def. 56.1") (ECF No. 84) ¶ 9; Pl.'s 56.1 Counter-Statement ("Pl. 56.1") (ECF No. 86) ¶ 9.) Plaintiff worked at the DOT's Sprainbrook Yard, located in Yonkers, New York.  (Def. 56.1 ¶ 12; Pl. 56.1 ¶ 12.)  As a Highway Maintenance Worker Trainee II, Plaintiff's duties included operating heavy machinery, performing maintenance on equipment, and general repair and maintenance of highways and bridges.  (Def. 56.1 ¶ 10; Pl. 56.1 ¶ 10.)  Upon his hire, Plaintiff received the DOT's Employee Handbook.  (Def. 56.1 ¶ 11; Pl. 56.1 ¶ 11.)

The highway maintenance workers of the Sprainbrook Yard were organized into two crews, each headed by a Highway Maintenance Supervisor I ("HMSI").  (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14.)  The HMSIs at Sprainbrook Yard during the period of Plaintiff's employment with the DOT were Richard Conklin and Defendant Barranco.  (Def. 56.1 ¶ 15; Pl. 56.1 ¶ 15.)  Defendant Krasnow was a highway maintenance worker assigned to Barranco's crew.  (Def. 56.1 ¶ 18; Pl. 56.1 ¶ 18.)  Plaintiff worked with Conklin's crew about 60% of the time, and Conklin prepared both of Plaintiff's probationary reviews.  (Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.)

During the period of Plaintiff's employment, the HMSIs at Sprainbrook Yard reported to Keith O'Connor ("O'Connor"), the Highway Maintenance Supervisor II of Sprainbrook Yard. (Def. 56.1 ¶¶ 13–14; Pl. 56.1 ¶¶ 13–14.)  O'Connor reported to Dyan Rajasingham, the Acting

Resident Engineer for the area including Sprainbrook Yard.  (Def. 56.1 ¶¶ 19–20; Pl. 56.1 ¶¶ 19–20.)  Rajasingham reported to Peter Teliska, Regional Transportation Maintenance Engineer for the area including Sprainbrook Yard.  (Def. 56.1 ¶ 21; Pl. 56.1 ¶ 21.)

### B.  Plaintiff's Work Performance

#### i.  *Plaintiff's First Review*

As a probationary employee, Plaintiff received quarterly probation reports.  (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.)  Conklin prepared Plaintiff's first, 13-week probationary report (the "First Review"), dated June 23, 2015, which Plaintiff reviewed and signed.  (Def. 56.1 ¶ 23; Pl. 56.1 ¶ 23.)  The template for performance reviews lists a series of "Performance Factors" and a supervisor provides the employee a grade for each performance factor of either "Outstanding," "Above Average," "Satisfactory," "Needs Improvement," "Unsatisfactory," or "Not Applicable." (Def. 56.1 ¶¶ 24, 53; Pl. 56.1 ¶¶ 24, 53.)  In the First Review, Conklin did not give Plaintiff any marks of "Outstanding" or "Above Average," and noted that Plaintiff needed improvement in the areas of "Work Habits," "Work Interest," "Relationships with People," "Relationship with Supervisor," and "Manual Skill/Equipment Operation."  (Def. 56.1 ¶ 25; Pl. 56.1 ¶ 25.) However, Plaintiff's overall performance was rated as "satisfactory."  (Pl. 56.1 ¶ 25; Declaration of Richard Conklin ("Conklin Decl.") (ECF No. 83) Ex. A.)

#### ii.  *Tardiness*

DOT time records indicate that Plaintiff was late for his 7:30 a.m. start time nine times between May 8, 2015, and July 30, 2015.  (Def. 56.1 ¶ 29, 53; Pl. 56.1 ¶ 29.)  The Employee Handbook Plaintiff had received contained rules and penalties concerning tardiness.  (Def. 56.1 ¶ 27, 53; Pl. 56.1 ¶ 27.)  The Employee Handbook noted that a "pattern of being late . . . constitutes misconduct and may . . . result in disciplinary action."  (*Id.*)

In July 2015, O'Connor reported to Rajasingham that he had personally observed that Plaintiff was frequently late.  (Def. 56.1 ¶ 26, 53; Pl. 56.1 ¶ 26.)  At Rajasingham's direction, O'Connor prepared a counseling memorandum (the "Counseling Memorandum") dated July 21, 2015, for Plaintiff concerning his tardiness, which Plaintiff reviewed and signed.  (Def. 56.1 ¶¶ 30–31; Pl. 56.1 ¶¶ 30–31.)  In the Counseling Memorandum, Plaintiff was informed that he could no longer make up time by using accrued vacation, holiday, or personal time to cover any instances of tardiness.  (Def. 56.1 ¶ 32; Pl. 56.1 ¶ 32.)  Rather, this time would be charged to "Absence without Leave" ("AWOL") as warranted.  (*Id.*)  Plaintiff was further cautioned that tardiness and AWOL were violations of Civil Service Rules and may result in additional disciplinary action.  (Def. 56.1 ¶ 33; Pl. 56.1 ¶ 33.)  After receiving the Counseling Memorandum, Plaintiff was late again on July 30, 2015.  (Def. 56.1 ¶ 34; Pl. 56.1 ¶ 34.)

> iii.     *Failure to Personally Report Absences*

Plaintiff violated other DOT rules included in the Employee Handbook by failing to personally report absences to his supervisors within two hours of the start of his workday.  (Def. 56.1 ¶¶ 35–36; Pl. 56.1 ¶¶ 35–36.)  On June 24, 2015, Plaintiff left work in the morning and was absent for the remainder of the day.  (Def. 56.1 ¶ 37; Pl. 56.1 ¶ 37.)  That evening, his fiancé, Melissa Murphy, sent text messages to several DOT employees, including Barranco, to inform them that Plaintiff would be out of work the next two days.  (Def. 56.1 ¶ 38; Pl. 56.1 ¶ 38.)  Plaintiff again failed to personally report absences from work on July 7, 2015, when Murphy texted several DOT employees, including Barranco, to inform them Plaintiff would be absent on July 8 and 9, 2015.  (Def. 56.1 ¶¶ 39–40; Pl. 56.1 ¶¶ 39–40.)  On each of the foregoing occasions, Barranco replied to Murphy's text messages and informed her that Plaintiff should directly report his absences to O'Connor.  ((Def. 56.1 ¶ 41; Pl. 56.1 ¶ 41.)

iv.   *Workplace Injuries*

Plaintiff also failed to adhere to the DOT's rules in the Employee Handbook regarding the reporting of injuries.  The Employee Handbook requires that employees report any accident, however minor, to their supervisor when it occurs; "Failure to report an accident in a timely manner may result in a loss or delay in the receipt of all the benefits due."  (Def. 56.1 ¶ 42; Pl. 56.1 ¶ 42.)  Plaintiff claims he was bitten by a tick at work on June 8, 2015, but he did not report his injury until Murphy texted Plaintiff's supervisors on June 24, 2015.  (Def. 56.1 ¶¶ 43–44; Pl. 56.1 ¶¶ 43–44.)  Plaintiff also claims he sustained an injury to his foot and ankle on July 30, 2015, but did not file workers' compensation forms related to that injury as well as the tick bite until August 5, 2015.  (Def. 56.1 ¶¶ 45–46; Pl. 56.1 ¶¶ 45–46.)

Plaintiff further claims he sustained a second ankle injury on August 5, 2015.[3]  (Def. 56.1 ¶ 47; Pl. 56.1 ¶ 47.)  An investigation into Plaintiff's three workplace injuries determined that two of those injuries were preventable.  (Def. 56.1 ¶ 48; Pl. 56.1 ¶ 48.)

v.   *Second Review*

Plaintiff's 26-week probationary report (the "Second Review"), dated September 23, 2015, was prepared by Conklin.  (Def. 56.1 ¶ 52; Pl. 56.1 ¶ 52.)  In the Second Review, Plaintiff was not given any marks of Outstanding or Above Average and was found to need improvement in the areas of "Quantity of Work," "Work Habits," "Work Interest," "Analytical and Problem Solving Abilities," and "Manual Skill/Equipment Operation."  (Def. 56.1 ¶ 54; Pl. 56.1 ¶ 54.)  Plaintiff was marked as Unsatisfactory in "Written and Oral Communication," "Attendance/Punctuality," "Relationships with People," "Relationship with Supervisor," "Safety," and "Quality of Work."  (*Id.*)

---

[3] The August 5, 2015 injury is described in further detail *infra* pp. 10–11.

### C.  Plaintiff's Complaints and Alleged Harassment

On or about June 29, 2015, approximately a week after receiving his unfavorable First Review, Plaintiff sent a letter (the "June 29th Letter") addressed to "Joan McDonald, Commissioner, William Gorton, Regional Director, and Dyan Rajasingham, Regional Supervisor."  (Def. 56.1 ¶ 56; Pl. 56.1 ¶ 56.)  In the June 29th Letter, Plaintiff claims he was "threatened by other workers, lied about to my supervisors, not protected by my supervisors (with the exception of one supervisor) from harassment that has occurred," and that "another worker has told me that he was making me a pair of cement boots."  (Def. 56.1 ¶ 57; Pl. 56.1 ¶ 57.)  Plaintiff does not identify any individual responsible for the harassment, does not state that he is Italian, and does not state that he has suffered harassment related to his Italian national origin.  (Def. 56.1 ¶ 58; Pl. 56.1 ¶ 58.)  Instead, Plaintiff attributes his harassment in the June 29th Letter to the fact that he is a probationary employee.  (Def. 56.1 ¶ 61; Pl. 56.1 ¶ 61.)  He states, "The collective attitude toward probationary employees is totally unprofessional, totally unacceptable and against [DOT] Policies and Practices.  It is my humble request that you look into this matter and take some serious steps in this regard to improve the conduct and behavior creating a harassment-free work environment for all."  (*Id.*)

Plaintiff sent a second letter dated July 22, 2015 (the "July 22nd Letter"), approximately one day after he was counseled for his tardiness, addressed to "Matthew J. Driscoll, Commissioner; Pete Teliska, Regional Director; and Dyan Rajasingham, Regional Supervisor." (Def. 56.1 ¶ 62; Pl. 56.1 ¶ 62.)  In the July 22nd Letter, Plaintiff contests the contents of the Counseling Memorandum, stating that he had a "consistent history of reporting to duty promptly."  (Def. 56.1 ¶ 63; Pl. 56.1 ¶ 63; Decl. of Peter Teliska ("Teliska Decl.") (ECF No. 82) Ex. A.)  Plaintiff further states, "[H]arassment in the yard has ceased and I sincerely thank you

and my managers for that but, I feel there is a continued level of harassment against me from Regional Management for speaking-up [sic] that I believe needs to be addressed." (*Id.*)  As in the June 29th Letter, Plaintiff does not mention that he is Italian or that he has suffered any harassment or discrimination related to his Italian origins.  (Def. 56.1 ¶ 64; Pl. 56.1 ¶ 64.)

On July 30, 2015, Plaintiff's fiancé e-mailed a third letter (the "July 30th Letter") to Peter Teliska, Bill Gorton, and Keith O'Connor on Plaintiff's behalf.  (Def. 56.1 ¶ 65; Pl. 56.1 ¶ 65.) In the July 30th Letter, Plaintiff complains about the "rude and incompetent behavior of Hector- a Foreman in the Sprain Brook Yard."  (Def. 56.1 ¶ 66; Pl. 56.1 ¶ 66; Teliska Decl. Ex. A.) Plaintiff claims that Hector, presumably referring to Defendant Barranco, has harassed and threatened him and allowed other workers to "continue making rude comments and threats" toward him.  (*Id.*)  Plaintiff states that this is "retaliation for the previous letters I have written regarding this treatment."  (Teliska Decl. Ex. A.)  In the July 30th Letter, Plaintiff further claims that Defendant Barranco intentionally sent him to the wrong facility "to be tested on the Chipper."  (Def. 56.1 ¶ 67; Pl. 56.1 ¶ 67.)  Plaintiff ultimately obtained his "Chipper" certification and was not disciplined in any way in connection with his being sent to the wrong location for his test.  (Def. 56.1 ¶ 68; Pl. 56.1 ¶ 68.)  Again, Plaintiff does not state in the July 30th Letter that he is Italian or has suffered any harassment related to his Italian origins.  (Def. 56.1 ¶ 69; Pl. 56.1 ¶ 69.)

On August 3, 2015, a meeting was held at the DOT Poughkeepsie Office with Plaintiff, Rajasingham, O'Connor, Teliska, and Timothy Werder, Administrative Services Director for Region 8, to discuss Plaintiff's performance issues and complaints.  (Def. 56.1 ¶ 70; Pl. 56.1 ¶ 70.)  There is a dispute as to whether Plaintiff disclosed at that meeting any complaints related to discrimination or harassment based on his Italian heritage.  (Def. 56.1 ¶ 71; Pl. 56.1 ¶ 71.)

Defendants deny that he did so, while Plaintiff claims he revealed that he was called "Guinea" by Defendant Krasnow and others.  (Teliska Decl. ¶¶ 10–12; Decl. of Dyan Rajasingham ("Rajasingham Decl.") (ECF No. 79) ¶ 12; Decl. of Alexander Sakin ("Sakin Decl.") (ECF No. 88) Ex. 1 ("Pl. Dep.") 312, 316.)

On August 5, 2015, an email from Plaintiff's account was sent to Teliska, O'Connor, Werder, and Rajasingham, which included a letter (the "August 5th Letter") and a 32-second-long video clip.  (Def. 56.1 ¶ 72; Pl. 56.1 ¶ 72.)  Plaintiff's fiancé wrote the email and the August 5th Letter and sent it on Plaintiff's behalf, because Plaintiff was in the hospital.  (Def. 56.1 ¶¶ 73–74; Pl. Dep. 235–39.)  Plaintiff did not contribute to the August 5th Letter.[4]  (Id.)  However, Plaintiff recorded and sent the video accompanying the August 5th Letter to his fiancé earlier in the day. (Pl. Dep. 235, 238–39.)

In the video clip, Plaintiff appears to be standing on the side of a road with fast-moving traffic and states, "I am here at the State DOT on the side of the road picking paper by myself with no backup truck along this turn over here by the Hutch . . . It's not safe at all.  So I'm gonna pick paper, if I get hit, it's your guys' problem.  Thank you, Mike."  (Def. 56.1 ¶ 76; Decl. of Benjamin Liebowitz ("Liebowitz Decl.") (ECF No. 78) Ex. O.)[5]  In the August 5th Letter, Plaintiff's fiancé writes that Plaintiff has attempted to advocate for a "positive workplace" but that earlier that day his "safety was seriously compromised" when he was forced by Defendant Barranco to pick up paper on the side of a busy road without a backup truck.  (Id. Ex. N.)  She further states that Plaintiff was placed on a crew with Defendants Barranco and Krasnow,

---

[4] Plaintiff disputes these assertions based on his prior testimony, at the same deposition, that he was the writer and sender of the August 5th Letter and email.  (Pl. 56.1 ¶¶ 73–74; Pl. Dep. at 234.)  However, Plaintiff subsequently clarified, several times, that his wife wrote and sent the email on his behalf and that he did not contribute to it other than sending the video to her earlier that day.  (Pl. Dep. 61, 235–39.)

[5] Plaintiff denies this but provides no reasoning or factual support from the record to support his denial. (Pl. 56.1 ¶ 76.)  Moreover, the Court's independent review of the video clip confirms that this is an accurate description of its contents.  (See Liebowitz Decl. Ex. O.)

Plaintiff's "main harassers," for the past two days.  (*Id.*)  Krasnow allegedly called Plaintiff a "parakeet rat" the day before and Barranco allegedly scolded Plaintiff when he attempted to greet another worker at the yard.  (*Id.*)  Plaintiff's fiancé did not state that Plaintiff is Italian or that he suffered any harassment on the basis of his Italian background.  (Def. 56.1 ¶ 77; Pl. 56.1 ¶ 77.)

Though Plaintiff never included any allegations of anti-Italian slurs or harassment in his numerous written complaints, and no other witness to such conduct has been identified, Plaintiff nonetheless claims that he endured "daily anti-Italian harassment," and that he made several verbal complaints to superiors about this harassment.  (Pl.'s 56.1 Statement of Additional Facts ("Pl. Add. 56.1") (ECF No. 86) ¶¶ 1–2.)  Plaintiff's fiancé, Murphy, testified that during his employment, Plaintiff complained of being called "Guinea" or "off the boat" and stated he was being harassed by Defendants at work every day.  (Pl. Add. 56.1 ¶ 3; Sakin Decl. Exs. 2–4 ("Murphy Dep.") 28.)  Plaintiff himself has made contradictory statements about the duration of the harassment, averring in his First Amended Complaint and in his Equal Employment Opportunity Commission ("EEOC") Charge that he was called "Guinea" by Defendant Krasnow on March 20, 2015, and by Krasnow, Barranco, and two other co-workers from March 23 through April 3, 2015, rather than for the entire duration of his employment with the DOT. (FAC ¶¶ 32–37; Pl. Dep. 71 (describing EEOC Charge shown to Plaintiff).)  Defendants and other DOT witnesses deny that any anti-Italian harassment occurred or that Plaintiff ever complained about any such harassment.  (Def. 56.1 ¶¶ 78–79.)  Plaintiff concedes that O'Connor, Conklin, Teliska, and Rajasingham never harassed him or discriminated against him on the basis of his Italian national origin.  (Def. 56.1 ¶ 80; Pl. 56.1 ¶ 80.)

### D.  The August 5th Accident

On August 5, 2015, Plaintiff alleges he was the "only one" ordered to pick up trash from the side of the road without a backup truck for protection, and that he injured his ankle as a result.  (Def. 56.1 ¶¶ 81–82; Pl. 56.1 ¶¶ 81–82.)  As a result of the ankle injury, Plaintiff filed workers' compensation forms dated August 5, 2015, and August 8, 2015 (the "Workers' Compensation Forms").  (Def. 56.1 ¶ 82; Pl. 56.1 ¶ 82.)  In the Workers' Compensation Forms, Plaintiff indicated that he sustained his ankle injury when he "needed to run from a car that almost hit [him]—[he] tripped over the guardrail," and that the alleged accident occurred at 2:00 p.m. on August 5, 2015.  (Def. 56.1 ¶ 83; Pl. 56.1 ¶ 83.)  Similarly, an August 5, 2015, e-mail from Plaintiff's e-mail account to O'Connor and Rajasingham, which Plaintiff claims Murphy wrote without his input, states that his injury was caused when he had to "run out of the way towards safety" to avoid a car and as a result twisted his ankle.  (Def. 56.1 ¶ 84; Pl. 56.1 ¶ 84.)

However, Plaintiff subsequently filed a police report dated August 19, 2015, claiming that he was injured when he was hit by a car at 2:00 p.m. on August 5, 2015.  (Def. 56.1 ¶ 85; Pl. 56.1 ¶ 85.)  Plaintiff also filed a claim with his mother's car insurance carrier, GEICO Insurance Company ("Geico") for the same purported injury (the "Geico claim").  (Def. 56.1 ¶ 87; Pl. 56.1 ¶ 87.)  On November 10, 2016, Plaintiff testified at a deposition that was part of the Geico claim that on August 5, 2015, he was hit by a car and sustained injuries to his ankle.  (Def. 56.1 ¶¶ 88–89; Pl. 56.1 ¶¶ 88–89.)  At the Geico deposition, Plaintiff testified that when the accident occurred, "[his] workers were all there" picking up paper when "all of a sudden, [they] saw a car coming."  (Def. 56.1 ¶ 90; Pl. 56.1 ¶ 90.)  While Plaintiff tried to run to safety, he states he was struck by the car and propelled into the guardrail, causing injuries to his ankle and foot."  (*Id.*)

In his deposition in this action, Plaintiff claimed that he sustained his injury in the morning of August 5, 2015, and that he was hit by a car.  (Def. 56.1 ¶ 86; Pl. 56.1 ¶ 86.)  Plaintiff further stated that other DOT workers were up the road from him, on the same side of the highway, and that they had a backup truck.  (Pl. Dep. 330–33.)  However, Plaintiff averred that both he and the other workers were in danger when the car passed because the backup truck was not set up in the right place.  (*Id.*)  Moreover, Plaintiff admitted that if the backup truck had been set up in the right place, it would have protected him.  (*Id.*)

Plaintiff never returned to work after the August 5, 2015, accident.  (Def. 56.1 ¶ 93; Pl. 56.1 ¶ 93.)

### E.  Plaintiff's Termination

On September 4, 2015, Teliska requested that Plaintiff be terminated based on his poor performance.  (Def. 56.1 ¶ 94; Pl. 56.1 ¶ 94.)  Specifically, Teliska concluded Plaintiff should be terminated based on Plaintiff's performance as a probationary employee, including frequent lateness, repeated failure to directly contact his supervisors when he was going to be absent, failure to timely report injuries, failure to contribute to a positive and productive workplace, and poor performance as documented in his First Review.  (Def. 56.1 ¶ 95; Pl. 56.1 ¶ 95.)  Rajasingham was involved in the decision to terminate Plaintiff's employment and agreed that Plaintiff should be terminated because he was unproductive, did not contribute to a safe working environment, was frequently late, failed to directly contact his supervisors when he was going to be absent, and failed to timely report injuries to his supervisors.  (Def. 56.1 ¶¶ 96–97; Pl. 56.1 ¶¶ 96–97.)

After making the request to terminate Plaintiff, Teliska was instructed by Werder to have Plaintiff's Second Review completed and to include it with his request.  (Def. 56.1 ¶ 98; Pl. 56.1

¶ 98.)  When Conklin completed Plaintiff's Second Review, Teliska renewed his request to

terminate Plaintiff's employment and it was granted and September 25, 2015.  (Def. 56.1 ¶ 99;

Pl. 56.1 ¶ 99.)  Plaintiff's employment was terminated effective October 2, 2015.  (Def. 56.1 ¶

100; Pl. 56.1 ¶ 100.)  Neither Barranco nor Krasnow participated in the decision to terminate

Plaintiff.  (Def. 56.1 ¶¶ 101–02; Pl. 56.1 ¶¶ 101–02.)

## LEGAL STANDARD

Summary judgment is appropriate if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury

could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986); *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013).

A court should grant summary judgment when a party who bears the burden of proof at

trial "fails to make a showing sufficient to establish the existence of an element essential to that

party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "In such a situation, there can

be no genuine issue as to any material fact, since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts

immaterial."  *Id.* at 323 (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must "constru[e] the evidence in

the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its

favor."  *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal

quotation marks omitted).  However, the nonmoving party "may not rely on conclusory

allegations or unsubstantiated speculation."  *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d

Cir. 2010) (internal citation and quotation marks omitted).  Further, "[s]tatements that are devoid

of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir. 2008) ("Even in the discrimination context ... a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").

## DISCUSSION

### I. Title VII

#### a. Discrimination Claim

Title VII provides that an employer cannot discriminate against "any individual" based on that individual's "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). To establish a *prima facie* case of discrimination under Title VII, a plaintiff must prove that (1) he is a member of a protected class; (2) he is qualified for the position held; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of discrimination. *Stratton v. Department for the Aging for City of New York*, 132 F.3d 869, 878 (2d Cir. 1997) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). To establish an inference of discrimination, a plaintiff must prove that an adverse employment action was taken against him "because of discriminatory animus on the part of [his] employer." *See Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999).

For Title VII discrimination claims based on disparate treatment, a plaintiff must also show that "[he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare h[im]self." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("When considering whether a plaintiff has raised an inference of discrimination by showing that

13

she was subjected to disparate treatment, we have said that the plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself.").

On a motion for summary judgment in a case wherein a plaintiff asserts that the employer's decision was a pretext for discrimination, the plaintiff's discrimination claim is subject to the *McDonnell Douglas* burden-shifting standard. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015). Under this framework, a plaintiff bears the initial burden of demonstrating his *prima facie* case. *Cortes v. MTA New York Transit*, 802 F.3d 226, 231 (2d Cir. 2015). "The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minim[i]s.*" *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal quotation marks omitted). Once a plaintiff demonstrates a *prima facie* case, a "presumption arises that the employer unlawfully discriminated." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). The burden then "shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *McDonnell Douglas Corp.*, 411 U.S. at 802. If the employer articulates a non-discriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–11 (1993).

The "final and ultimate burden" then returns to the plaintiff to demonstrate that "defendant's reason is in fact pretext for unlawful discrimination." *See Cortes*, 802 F.3d at 231. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks

14

omitted) (citation omitted).  A plaintiff may meet his final burden by relying on direct or indirect evidence demonstrating that "an impermissible reason was a 'motivating factor,' without proving that the employer's proffered explanation' played no role in its conduct."  *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001) (quoting *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir.1997)).  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination."  *Weinstock*, 224 F.3d at 42.

Defendants do not dispute that Plaintiff, who identifies as Italian-American, is a member of a protected class under Title VII and was qualified for his position.  Nor do Defendants contest that Plaintiff suffered an adverse employment action when he was terminated on October 2, 2015.  However, Defendants contend that Plaintiff has not presented sufficient evidence to satisfy the fourth prong of his *prima facie* national origin discrimination claim.  Further, Defendants state that even if Plaintiff has proven his *prima facie* case, Defendants have supplied a legitimate, non-discriminatory reason for his termination, and Plaintiff has not demonstrated that the proposed reason is pretext for discrimination.  Accordingly, this Court considers whether a genuine issue of material fact exists with respect to whether the circumstances surrounding Plaintiff's termination give rise to an inference of discrimination, and whether the parties have met their respective burdens at the second and third stage of the *McDonnell Douglas* analysis.

### i.  Inference of Discrimination

In his memorandum in opposition to Defendants' motion, Plaintiff claims that his termination was in violation of Title VII because it followed "a campaign of anti-Italian harassment and bullying."  (Pl.'s Mem. in Opposition to Defs.' Mot. to Dismiss ("Pl. Opp.") (ECF No. 85) 20.)  Plaintiff explains that "[e]ven though the decision to terminate Plaintiff was

approved by senior DOT management, and not by any of the persons who harassed Plaintiff," the Second Review "was plainly driven by the racist bullying [Plaintiff] endured at the hands of Barranco and Krasnow."  (*Id.*)  Specifically, Plaintiff contends that the Second Review's assessment of Plaintiff as having poor relationships with people and with his supervisor, as well as having made "false accusations against other employees," "essentially penalized Plaintiff for resenting the anti-Italian animus of his workplace and for raising complaints."  (*Id.* 20–21.) Finally, Plaintiff states that because the Second Review "was necessarily based on input from Barranco as Plaintiff's supervisor, it simply crystallized Barranco's anti-Italian animus in the form of an improper adverse employment action."  (*Id.* 21.)

As to Plaintiff's contention that the Second Review demonstrates discriminatory animus, the record is clear that the decision to terminate Plaintiff was made by Teliska prior to the writing of the Second Review, as documented in Teliska's declaration in support of the instant motion and in his written correspondence with DOT personnel.  (Teliska Decl. ¶ 24, Ex. D.)  In that correspondence, Teliska detailed the basis of his decision, which included Plaintiff's history of failing to personally inform his supervisors when he was going to be late or absent, history of failing to timely report injuries to his supervisors, failure to follow direction, and the First Review, which identified several areas in which Plaintiff was deficient.  (Teliska Decl. Ex. D.) Moreover, the Second Review was prepared by Conklin, who Plaintiff concedes had no authority or input concerning the termination of DOT employees and did not harass or discriminate against Plaintiff based on his national origin.  (Declaration of Richard Conklin ("Conklin Decl.") (ECF No. 83) ¶ 13; Pl. Dep. 106, 190; Pl. 56.1 ¶¶ 16, 80.)  Most significantly, there is no evidence on the record even suggesting discriminatory animus on the part of Teliska or Rajasingham, the individuals responsible for the decision to terminate Plaintiff's employment.

Plaintiff's attempt to impute the alleged discriminatory animus of Barranco to the decisionmakers behind his employment termination by speculating that Barranco "necessarily" contributed to the Second Review likewise fails. As the Court has observed, Teliska's decision to terminate Plaintiff was made prior to the Second Review and based on a number of specific behavioral and performance issues. And even if the Second Review had been instrumental to Teliska and Rajasingham's final decision, there is no record evidence that Barranco was involved in its preparation. Plaintiff's attempts to draw a tenuous connection between Barranco's statement that he occasionally supervised Plaintiff and the preparation of the Second Review, (Declaration of Benjamin Liebowitz in Reply ("Liebowitz Reply Decl.") (ECF No. 90) Ex. C 15–16), fail to create an issue of fact in the face of Conklin's sworn statement that neither of the individual Defendants participated in preparing either of Plaintiff's probationary reports, (Conklin Decl. ¶ 15).

Again, there is no indication that Teliska or Rajasingham harbored discriminatory animus or sought to discharge Plaintiff because he was Italian. *See O'Sullivan v. New York Times*, 37 F. Supp. 2d 307, 321 (S.D.N.Y. 1999) ("[T]he bias of a non-decisionmaker is insufficient to prove an illegal motivation for an employer's discharge.") (citing *McLee v. Chrysler Corp.*, 109 F.3d 130, 136 (2d Cir. 1997)); *Legendre v. Chase Manhattan Bank*, No. 94 CIV. 2911 (JES), 1996 WL 514874, at *6 (S.D.N.Y. Sept. 10, 1996) (alleged discriminatory remark of coordinator made prior to plaintiff's discharge insufficient to establish an inference of discrimination without "competent evidence" that the coordinator played a role in plaintiff's discharge). Nor has Plaintiff pointed to any evidence that Teliska or Rajasingham showed "a preference for a person not of the protected class." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). In fact, Plaintiff now effectively disclaims that at least two of the comparators he identified in the

FAC were treated better than him.  (Pl. Dep. 43–49.)

In sum, since it is undisputed that Teliska and Rajasingham were the sole decisionmakers behind Plaintiff's termination and Plaintiff has produced no competent evidence that they were motivated by discriminatory animus, Plaintiff fails to make out a *prima facie* claim of national origin discrimination.

### ii. Legitimate Motive for Termination

Furthermore, even if Plaintiff had made out a *prima facie* claim, Defendants have successfully rebutted any presumption of discrimination by proffering a legitimate, non-discriminatory reason for terminating Plaintiff.  *See Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) ("The employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior.").  As the Court has explained, Teliska justified Plaintiff's termination, with input from Rajasingham, because Plaintiff had a documented history of poor performance and failure to follow DOT rules.  *See infra* p. 16.  The evidence supporting this rationale includes DOT time records, the Counseling Memorandum concerning Plaintiff's chronic tardiness, a second counseling memorandum concerning Plaintiff's preventable injuries, the written reviews prepared by Conklin, excerpts from the employee handbook given to Plaintiff, and text messages sent by Murphy to Plaintiff's supervisors, among other things.  (*See* Decl. of Keith O'Connor ("O'Connor Decl.") (ECF No. 80) Ex. A; Rajasingham Decl. Ex. B; Conklin Decl. Exs. A–B; Decl. of Kristen Demuth ("Demuth Decl.") (ECF No. 81) Exs. A–D; Liebowitz Decl. Ex. G.)

Plaintiff fails to present evidence sufficient to support a rational finding that the legitimate, non-discriminatory reasons proffered by Defendants were false, and that more likely than not discrimination was the real reason for his termination.  *See Weinstock*, 224 F.3d at 42.

Nor does he present evidence sufficient to support a rational finding that discrimination was a motivating factor in his termination.  *See Holtz*, 258 F.3d at 81.

Plaintiff denies some, but not all, of Defendants' allegations concerning his poor performance.  For example, Plaintiff has contested the accuracy his time records and the deficiencies identified in both of his performance reviews.  However, "[P]laintiff's subjective disagreement with his reviews is not a viable basis for a discrimination claim."  *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999).  "The relevant inquiry is not whether the performance-based justification for plaintiff's termination articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification."  *Miller v. Nat'l Ass'n of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010) (citation omitted).  Plaintiff does not accomplish this by disputing the accuracy of the DOT's timekeeping records.  Nor, with regard to the probationary reviews, is it the function of a fact-finder to "second-guess business decisions regarding what constitutes satisfactory work performance."  *Soderberg v. Gunther Int'l, Inc.*, 124 Fed. App'x 30, 32 (2d Cir. 2005) (quoting *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988)).

Moreover, as the Court has explained, Plaintiff's speculative allegations with regard to the Second Review do not suffice to create an issue of fact as to whether Rajasingham or Teliska harbored any discriminatory animus towards Plaintiff based on his national origin.  *See infra* pp. 16–18.

Accordingly, even if Plaintiff had presented a *prima facie* case of discriminatory termination, his claim would fail because Plaintiff presents no evidence creating an issue of fact as to whether Defendants' proffered reasons for terminating Plaintiff were pretextual.  Plaintiff's Title VII discrimination claim is dismissed.

### b. Hostile Work Environment

To establish a hostile work environment claim under Title VII, "a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Rivera v. Rochester Genesee Reg'l Trans. Auth.*, 743 F.3d 11, 20 (2d Cir. 2014) (internal quotation marks omitted). This standard has both objective and subjective elements: "the conduct complained of must be severe or pervasive enough that a reasonable person would find it hostile or abusive, and the victim must subjectively perceive the work environment to be abusive." *Raspardo v. Carlone*, 770 F.3d 97, 114 (2d Cir. 2014). Importantly, "a plaintiff need not show that h[is] hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered h[is] working conditions." *Pucino v. Verizon Communications, Inc.*, 618 F.3d 112, 119 (2d Cir. 2010) (emphases in original).

"In considering whether a plaintiff has met its burden as to the sufficiency of the purported harassment, 'courts should examin[e] the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's [job] performance.'" *Marquez v. City of New York*, No. 14-CV-8185 (AJN), 2016 WL 4767577, at *8 (S.D.N.Y. Sept. 12, 2016) (quoting *Rivera*, 743 F.3d at 20). These "standards for judging hostility are sufficiently demanding to ensure that Title VII does not became a general civility code," and "[p]roperly applied, they will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes,

and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted).

In its Order deciding Defendants' Motion to Dismiss dated September 13, 2018, the Court identified two sets of allegations in the FAC that gave rise to a plausible hostile work environment claim: (1) Plaintiff's allegations that he endured anti-Italian insults and slurs such as "Guinea" frequently over the six months of his employment with the DOT and (2) Plaintiff's allegation that he was purposely denied a backup truck when doing roadside work and consequently sustained permanent injuries to his foot. (ECF No. 43.) The Court noted that the verbal insults, while not severe, were sufficiently pervasive to state a hostile work environment claim; conversely, the backup truck incident, while confined to a single occurrence, was severe enough to state a hostile work environment claim. (*Id.*)

Defendants argue that subsequent discovery demonstrates the absence of an issue of fact as to whether either of these events actually occurred. (Def.'s Mem. in Support of Mot. to Dismiss ("Def. Mot.") (ECF No. 77) 9.) Specifically, Defendants state that Plaintiff's testimony indicates that he was not, in fact, singled out for denial of a backup truck. (*Id.* 9–10.) Further, Defendants aver that since the only evidence of pervasive anti-Italian slurs comes from Plaintiff's own inconsistent and implausible testimony, Plaintiff cannot overcome his burden of proof on those allegations to survive summary judgment. (*Id.* 10–15.) The Court addresses each of these arguments in turn.

### i. Allegations Related to the August 5, 2015, Incident[6]

At a deposition that took place on August 10, 2016, as part of the Geico claim, Plaintiff

---

[6] Plaintiff argues for the first time in his opposition that his allegations in the FAC regarding denial of a backup truck served "primarily as evidence of an adverse employment action taken on discriminatory grounds." (Pl. Opp. 13.) However, the Court explicitly noted in its Order deciding Defendants' Motion to Dismiss that "Plaintiff does not present Defendants' … failure to provide a backup truck as an adverse employment action." (ECF No. 43.)

testified that at the time of the August 5, 2015, incident, he was not alone, as he originally contended in the FAC, but with his "whole crew." (Liebowtiz Decl. Ex I 12–14.)  At his deposition in this action, Plaintiff confirmed that other members of his crew were in front of and behind him, between 100 and 200 feet away from him, on the same side of the road. (Pl. Dep. 331–32.)  Plaintiff further confirmed that those crew members were in the same danger as he was at the time of the accident.  (*Id.*)  While Plaintiff testified that the other crew members in his immediate vicinity had a backup truck, but he did not, he stated that neither he nor the other crew members were protected because the backup truck "was set up in the wrong spot." (*Id.* 332–33.) Tellingly, Plaintiff stated that if the truck had been set up properly, it would have protected not only his colleagues, but him as well.  (*Id.* 333.)

Plaintiff's charitable characterization of his testimony is that it was "marked by some inconsistency." (Pl. Opp. 14.)  Without addressing the crux of the problem with that testimony, Plaintiff proceeds to dismiss Defendants' arguments concerning this "inconsistency" as an "attempt to make hay."  (*Id.*)  But Plaintiff was not merely "inconsistent" in his description of the events of August 5, 2015.  He testified to a version of events that is entirely at odds with the allegations he made in the FAC.  According to Plaintiff, he was not, in fact, singled out for denial of the protection of a backup truck; rather, he was exposed to the same danger as every other member of his crew on August 15, 2015.  That Plaintiff insists the backup truck that should have protected him was not "his," even if believed, is of no moment; Plaintiff's own testimony reveals that he was not exposed to danger because he lacked a truck, but because the truck at the scene was not set up in a manner that would have protected anyone.

Based on the foregoing, the Court concludes there is no evidence upon which a

---

Moreover, the Court found that Plaintiff provided no facts to support a conclusion that failure to provide Plaintiff with a backup truck was a materially adverse departure from procedure.  (*Id.*)

reasonable juror could find that Plaintiff was denied a backup truck and exposed to serious danger because of his national origin.  To the extent Plaintiff's hostile work environment claim is premised on such allegation, it fails as a matter of law.

### ii. Allegations of Pervasive Anti-Italian Slurs

Plaintiff alleged in the FAC that he was called "Ginny [sic]" by Defendant Krasnow beginning on March 20, 2015, and by Krasnow, Barranco, and two other co-workers during the period between March 23, 2015, and April 3, 2015.  (FAC ¶¶ 32–37.)  Plaintiff also alleged in the FAC that "from in or about April 2015 to October 1, 2015," Krasnow harassed and threatened him "almost on a daily basis."  (*Id.* ¶ 51.)  In the July 22nd Letter, Plaintiff stated that "harassment in the yard has ceased."  (Teliska Decl. Ex. A.)

At his deposition, however, Plaintiff told a new story: he now claims that Krasnow and Barranco called him an anti-Italian slur "every day" he worked at the DOT.  (Pl. Dep. 83, 84, 86–87.)  He further states that he never returned to work after August 5, 2015, failing to explain how Krasnow's harassment nonetheless persisted for nearly two months after that.  (Pl. Dep. 341–342.)  Plaintiff testified that he reported the name-calling to his supervisors, including Barranco, one of his alleged harassers, "every day."  (*Id.* 86–87.)

It is undisputed that Plaintiff never included complaints about being called "Guinea," or any other allegations of anti-Italian bias in his workplace, in his numerous written complaints to DOT leadership.  Plaintiff states this is because he has "respect" and didn't "want to slander anybody else."  (*Id.* 94.)  Moreover, O'Connor, Conklin, Barranco, Rajasingham, and Teliska all deny that Plaintiff ever reported anti-Italian harassment to them.  (O'Connor Decl. ¶ 11; Conklin Decl. ¶ 18; Liebowitz Decl. Ex. C ("Barranco Dep.") 23; Rajasingham Decl. ¶ 12; Teliska Decl. ¶ 13.)

Defendants contend that given the lack of corroborating evidence that Plaintiff was called an anti-Italian slur and the inconsistencies in Plaintiff's testimony, he cannot create an issue of fact as to whether he endured a hostile work environment based on his national origin.

"While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' … and thus whether there are any 'genuine' issues of material fact, without making some assessment of the plaintiff's account. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (internal citation omitted).  Nonetheless, under these circumstances, "the moving party still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Id.* (citing *Fischl v. Armitage*, 128 F.3d 50, 56 (2d Cir. 1997)).

Here, the only direct support for Plaintiff's assertions that he was called "Guinea" by his colleagues is derived from Plaintiff's own testimony.[7]  A review of Plaintiff's deposition reveals that Plaintiff is frequently evasive, argumentative, and unwilling to provide direct answers about his claims.  More importantly, Plaintiff contradicts many of his own key allegations.  For example, Plaintiff described two colleagues who were not "called discriminatory names" in the FAC, (FAC ¶ 90), but claimed that both colleagues were referred to using ethnic slurs at his deposition, (Pl. Dep. 43–49.)  He stated unequivocally that he wrote certain emails to

---

[7] Though Plaintiff points out that Murphy testified Plaintiff complained to her about being called "Guinea" over the course of his employment with the DOT, he makes no argument that she actually witnessed any of the alleged conduct.  Nor does he present any argument as to whether her testimony falls under any hearsay exception. Further, Defendant Krasnow's "history of offensive conduct while at work," which does not consist of documentation of any other instance of discrimination based on national origin, is irrelevant and, contrary to Plaintiff's contentions, does not make it any more likely that Krasnow called Plaintiff "Guinea."  The same is true of Plaintiff's purported treatment by a psychiatrist for "bullying at work."

Defendants, only to immediately walk back that story and state that his wife wrote them independently.  (Pl. Dep. 61, 234–39.)  He has also given several conflicting accounts of the August 5, 2015, accident.  *See infra* pp. 10–11.

With regard to Plaintiff's hostile work environment claim, Plaintiff has given conflicting testimony as to the frequency and duration of the alleged anti-Italian harassment leveled against him.  The question for the Court is whether, in light of such conflicting accounts, a reasonable juror could nonetheless find on Plaintiff's testimony that Plaintiff suffered a hostile work environment on account of his national origin.

The Court is in agreement with Defendants that much of Plaintiff's testimony is inconsistent and, frankly, implausible.  Indeed, it strains credulity that the same Plaintiff who allegedly excluded specific allegations of anti-Italian name-calling to "maintain some semblance of civility and politeness," (Pl. Opp. 9), was comfortable enough to utter the N-word on the record at a deposition, (Pl. Dep. 94.)  Plaintiff's sense of decorum likewise did not extend to the August 5, 2015, email to O'Connor and Rajasingham, where Plaintiff asked his supervisors to "please inform Hector I am not 'full of shit.'"  (Liebowitz Decl. Ex. P.)  Nor did Plaintiff's concern about "slandering" others prevent him from labeling Barranco as "rude and incompetent" and accusing him of "exploiting his position for his personal gains" in the July 30th Letter.  (Teliska Decl. Ex. A.)  It is beyond dispute that, should Plaintiff take his claim to trial, he faces a high hurdle largely of his own making with regard to credibility.

Nonetheless, Plaintiff has consistently claimed his colleagues called him "Guinea" for some duration of time while he worked for the DOT.  Though perhaps unlikely, it would not be unreasonable for a juror to believe that Plaintiff endured such insults, and that they contributed to a hostile work environment.  *See Leopold v. Baccarat, Inc.*, 174 F.3d 261, 269 (2d Cir. 1999)

(although plaintiff's testimony was "somewhat inconsistent with respect to the frequency of the [alleged sexist] comments, that evidence must be viewed in the light most favorable to [plaintiff] as the nonmoving party," and was "sufficient to support a finding" that discrimination was pervasive).  In any event, it is not the role of the Court to judge the veracity of Plaintiff's statements.

In sum, while Plaintiff's case is razor thin, the Court finds there remains an issue of fact as to whether Plaintiff suffered a hostile work environment based on his Italian American heritage.  Defendants' motion to dismiss Plaintiff's Title VII hostile work environment claim is denied to this extent.

### c. Retaliation

Like Title VII discrimination claims, Title VII retaliation claims "are evaluated using a three-step burden shifting analysis." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010).

First, to establish a prima facie case of retaliation, a Plaintiff must adduce sufficient evidence from which a reasonable trier of fact could find:

> (1) that [ ]he engaged in protected activity under the anti-discrimination statutes, (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."

*Gachette v. Metro N.-High Bridge*, No. 17-CV-209, 2018 WL 456723, at *2 (2d Cir. Jan. 18, 2018).  An action is sufficiently adverse to sustain a claim of retaliation where it is "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010) (internal quotation marks omitted).

If a plaintiff satisfies this initial burden, "a presumption of retaliation arises." *Hicks*, 593 F.3d 164 (internal citation omitted). The burden of production then shifts to the defendant, who must "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Id.* (citation omitted).  If the defendant provides such an explanation, "the presumption of retaliation dissipates," *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005), and the plaintiff must prove "that the desire to retaliate was the but-for cause of the challenged employment action," *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S.Ct. 2517, 2528 (2013).

The substance of Plaintiff's retaliation claim is that his employment was terminated because he made complaints about anti-Italian harassment.  As the Court has noted, there is no reasonable dispute that such complaints do not appear in Plaintiff's numerous written grievances addressed to DOT supervisors.  Nonetheless, Plaintiff alleges that he made verbal complaints that he was called "Guinea" by Defendant Krasnow and others at an August 3, 2015, meeting held at the DOT Poughkeepsie Office.  (Pl. Dep. 312, 316.)  Teliska and Rajasingham were both among those present at the meeting, but they deny that Plaintiff made any complaints related to discrimination or harassment based on Plaintiff's Italian heritage.  (Teliska Decl. ¶¶ 10–12; Rajasingham Decl. ¶ 12.)  Plaintiff also alleges that he made verbal complaints about being called "Guinea" at the beginning of his employment to O'Connor, but not after that.  (Pl. Dep. 280–82.)  However, in the same contradictory fashion that characterizes much of Plaintiff's testimony, Plaintiff states elsewhere that he spoke with O'Connor, Barranco, and Conklin "every day" about Krasnow calling him "Guinea."  (*Id.* 86–87.)

Because Plaintiff contends that his termination took place approximately two months after he complained to Teliska and Rajasingham, the DOT decisionmakers behind his termination, about anti-Italian discrimination, Plaintiff establishes causation sufficient to support

his *prima facie* retaliation claim.  *See Gorman–Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001) ("[A] plaintiff can indirectly establish a causal connection to support a … retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." (internal quotation marks and alterations omitted)).  In response, Defendants proffer legitimate, non-retaliatory reasons for Plaintiff's termination.  *See infra* p. 18.

Plaintiff has not produced evidence sufficient to permit a rational factfinder to determine that Defendants' reasons are pretext and that the desire to retaliate against Plaintiff for complaining about national origin discrimination was the but-for cause of Plaintiff's termination. As the Court has explained, Plaintiff's dispute of the characterization of his work performance in his probationary reviews alone is insufficient to create an issue of fact as to whether the issues identified in the review are pretextual.  *See infra* p. 19.  Moreover, though Plaintiff may rely on temporal proximity to establish his *prima facie* case, "mere temporal proximity has been found by this Court to be insufficient to support a claim of retaliation at the summary judgment stage, at least where the defendant proffers a legitimate reason for the plaintiff's discharge with evidentiary support therefor."  *Galimore v. City Univ. of N. Y. Bronx Cmty. Coll.*, 641 F. Supp. 2d 269 (S.D.N.Y. 2009) (citing cases).

Accordingly, Plaintiff's Title VII retaliation claim is dismissed.

## II.   NYSHRL

The Second Circuit has held that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII."  *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997); *see Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011); *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 n.9 (2d Cir.

2008).  Accordingly, Plaintiff's discrimination and retaliation claims under the NYSHRL fail for the reasons the Court has described.

As to Plaintiff's NYSHRL hostile work environment claim, an individual is subject to liability under the NYSHRL (1) if he qualifies as an "employer" or (2) if he aided and abetted the unlawful discriminatory acts of others.  N.Y. Exec. Law § 296(1), (6); *see, e.g.*, *Gorman v. Covidien, LLC*, 146 F. Supp. 3d 509, 521–22 (S.D.N.Y. 2015); *E.E.O.C.* v. *Suffolk Laundry Servs., Inc.*, 48 F. Supp. 3d 497, 523 (E.D.N.Y. 2014).  Defendants argue that Barranco and Krasnow cannot be held individually liable under the NYSHRL.  First, Defendants contend that none of the individual Defendants are "employers" under the NYSHRL.  Second, assuming that their initial argument is successful, Defendants aver that the individual Defendants may not be sued as aiders and abettors because their employer, the DOT, is immune from suit under the Eleventh Amendment.[8]

Plaintiff does not address this argument in any manner in his opposition.  Accordingly, the Court deems Plaintiff's NYSHRL hostile work environment claim abandoned.  *See Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.") (citing *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 393 (S.D.N.Y. 1998) (collecting cases)); *accord Wu v. Metro-North Commuter R.R.*, No. 14-CV-7015–LTS–FM, 2015 WL 5567043, *6 (S.D.N.Y. Sept. 22, 2015); *Maher v. Alliance Mortg. Banking Corp.*, 650 F. Supp. 2d 249, 267–68 (E.D.N.Y. 2009); *Anti–Monopoly, Inc. v. Hasbro, Inc.,* 958 F. Supp. 895, 907 n. 11 (S.D.N.Y. 1997), *aff'd* 130 F.3d 1101 (2d Cir. 1997).

---

[8] Plaintiff's NYSHRL claims have been dismissed as against the DOT on the ground of Eleventh Amendment immunity.  (ECF No. 43.)

**III.     42 U.S.C. § 1983**

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979); *see Patterson v. County of Oneida*, 375 F.3d 206, 225 (2d Cir. 2004).

To state a claim under § 1983, a plaintiff must allege "(1) the challenged conduct was attributable to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed by the U.S. Constitution." *Castilla v. City of New York*, No. 09-CV-5446(SHS), 2013 WL 1803896, at *2 (S.D.N.Y. Apr. 25, 2013); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010); *Quinn v. Nassau Cty. Police Dep't*, 53 F. Supp. 2d 347, 354 (E.D.N.Y. 1999) ("[Section 1983] furnishes a cause of action for the violation of federal rights created by the Constitution.").

In its Order disposing of Defendants' motion to dismiss, the Court found that Plaintiff's § 1983 claim is premised solely on the Equal Protection Clause. Since there is a triable issue of fact as to whether Plaintiff suffered a hostile work environment, Plaintiff's § 1983 survives.

**CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in part and DENIED in part. Plaintiff's discrimination and retaliation claims under Title VII, and all of Plaintiff's remaining NYSHRL claims, are dismissed. Plaintiff's Title VII hostile work

environment claim against Defendants New York State Department of Transportation survives
except to the extent it is premised on Defendants' alleged denial of a backup truck to Plaintiff on
August 5, 2015.  Additionally, Plaintiff's § 1983 claim against Defendants Krasnow and
Barranco in their individual capacities survives.

A pretrial conference is hereby scheduled for November 12, 2020, at 10:00 a.m., via
teleconference.

To access the teleconference, please follow these directions: **(1) Dial the Meeting
Number: (877) 336-1839; (2) Enter the Access Code: 1231334** #; **(3) Press pound** (#) **to enter
the teleconference as a guest.**

In preparation for and while engaging in a teleconference, please follow these guidelines:

1. Use a landline whenever possible.

2. Use handset rather than speakerphone.

3. Identify yourself each time you speak.

4. Be mindful that, unlike in a courtroom setting, interrupting can render both speakers
   unintelligible.

5. **Mute** when not speaking to eliminate background noise, i.e., dog barking, kids
   playing, sirens, papers shuffling, emails pinging, drinking, breathing. It all comes
   through. This will also prevent interruptions.

6. Avoid voice-activated systems that don't allow the speaker to know when someone
   else is trying to speak and they cut off the beginning of words.

7. Spell proper names.

8. Have judge confirm reporter is on the line.

9. If someone hears beeps or musical chimes, that means someone has either come in or

    left the conference. Please be aware that the judge may need to clarify that the reporter

    has not lost the line. (This has happened before, and the reporter had to dial back in

    and tell the judge the last thing that the court reporter transcribed.)

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 76.

This constitutes the Court's Opinion and Order.


Dated:    October 1, 2020                                    SO ORDERED:
          White Plains, New York



                                              _____
                                                    NELSON S. ROMÁN
                                                 United States District Judge